We only have one case on the docket. It's Red v. City of Oklahoma City et al. 26145. And we'll hear first from Mr. Hittman. All right. If the court will allow me, I'd like to reserve four minutes for rebuttal. Okay. Okay. All right. So whenever you have an excessive forced claim by a free citizen, then we have to prove a seizure and that the seizure was unreasonable. That's the Vet v. K9 case recently written by this court. Judge McHugh was the author of that. And when you have a shooting that kills the citizen, that's clearly a seizure. So then it becomes just a question of whether or not the shooting was reasonable, which is a fact-bound inquiry. Then when you have the officer raising qualified immunity, that shifts the burden to us plaintiffs to show that there was a constitutional right violation that was clearly established. Okay. So in a scenario like this, those two inquiries basically overlap because it all becomes whether or not the officer had a reasonable explanation for the shooting. The overlap explanation has been talked about by this court in Medina v. Crime. That's a 2001 case. Okay. So then that's especially the case here because the officer's explanation was that Brian Sims went for a gun that he had in his car. And so that just, if the officer's life's threatened, then it's not a constitutional violation for the officer having shot the person. Okay. So then to figure out if it's a reasonable seizure or reasonable shooting, you have all of these factors that have to be considered, the well-known ground factors, the nine factors that have been isolated by this court, starting in 1995 by Judge Edel's opinion in Seaver, and then recently in the Bond case, these nine factors were again restated. Let me ask you this. It's pretty clear that factor two, the risk to the officer, is the most important of those factors. Would you agree? Absolutely. So if somebody pulls a gun on a police officer when they're relatively close to the police officer, don't we have case law that says the police officer is justified in responding by shooting the person? If actually the citizen pulls a gun and creates a scenario where it looks like he's not a constitutional violation for the officer to defend himself, like for anybody, anybody can defend themselves when they're under the threat of about to be shot. So if you accept Officer Galeon's testimony, face value, because that's very strongly what his defense is. That's what they state in their brief repeatedly. They say as a matter of law that Galeon's testimony should be these, you know, you're supposed to look at the totality of the circumstances as this court knows, because you've written a lot of cases on excessive force. And so when you factor in all of these circumstances, then you cannot accept, or I respectfully don't believe that you can accept the officer's self-serving testimony at face value. Why don't you, so that's the problem here, is that Brian Simmons is deceased. About the only real factual testimony about what happened was the officers. You tell us what evidence is persuasive that should cast doubt on the officer's version of what happened. Okay, all of the circumstances of how this went down. There's the gentleman sleeping in his car. The police officers come up and apparently, they say they woke him up, but they didn't announce that they were police officers. They say that he knew that. But weren't they in uniform? Right. They say that at the entryway to the parking lot, they were wearing uniforms, and therefore, Mr. Simms must have seen them when he went in. And because of that, they say that he must have known that they were officers. However, looking at the testimony of the two officers, when they woke him up, they said something to the effect of, hey, what's going on? And they came up from behind, and there were tinted windows. So you cannot just accept. Let me put it this way. It seems to me like there's a reasonable fact question as to whether or not Brian knew that they were police officers because he was asleep, and he didn't. Well, let me interrupt there because it's not clear he was asleep. He had his eyes closed, but according to Mr. Escobar, he had his hands up holding the wheel, which suggests to me he's not asleep because I don't know that your hands would stay up there. But in any event, he opened his eyes, and both of them, both Escobar and Galleon, I'm not sure quite how to pronounce his name, say that he went for the gun. That Mr. Simms moved his hands toward the gun, which was either in his lap or in his waistband. Officer Escobar actually says he didn't see him go for the gun. I said he began to bring his hands down toward the gun, and he said he didn't see him touch the gun, but he saw him go for the gun. I mean, are you saying he has to actually... He moved. When he saw the movement towards the gun, he got out of the line of fire, basically, right? Well, he also said that once he retreated a bit to get out of the line of fire, he saw Mr. Simmons continue to... He could see the upper body and the shoulders, and it was a motion that looked like he was withdrawing the gun from his waistband. He said something to the effect of when he stepped back, he saw the car move, and that the movement indicated to him that he was going for his gun. That's how I believe the facts shook out with respect to Officer Escobar's testimony. I would just suggest that when you take the reasonable inferences and the light most favorable to our side, a movement of a car does not indicate that someone's going for a gun. If you've just been woken up and you're startled waking up, you're going to move and the car will move. Anyway, I just don't see how the explanation... Is the essence of your argument, the kernel of it, that they should have announced that they were police? That is, would you bring this appeal if they had said police first? I don't think it's only that. I think that's part of it. Clearly, they should have made it clear that we're police when they're accusing somebody. According to their testimony, I believe the inferences in our favor, he was asleep or there with his eyes closed. I realize they mixed their story up somewhat because their story is not 100% consistent. You got to pull the facts, the light most favorable to us, the inferences, and all that on our side. I would believe that would mean he was asleep. The police officers, to me, obviously, at least there's a reasonable fact for a jury to say that surely the police should say we're the police, wake up, are you okay? I just want to know, are you asking and even do you have to ask for us to say that the never announced they were police and within half a second responded in a way that might be reasonable to respond to an intruder or a non-police officer and for that he got himself shot? Is that the essence of your argument? That's part of it, but there's also the important question of did he in fact go for his gun? Is it reasonable for a jury to conclude based on the inconsistencies or story whether or not he actually went for his gun because who would do that? Sure, it's possible because we live in an infinite universe, but it's also possible that he was startled, just woke up and was looking around and moving to figure out who was there and that he didn't actually go for the gun to shoot the officers. Okay, let me zero in on that because to me your answers to Judge Avell and Judge McHugh blazer in on a couple of things. One is in your exchange with Judge Avell that they did not announce themselves as the police, but you mentioned several times the fact that he was asleep. So I kind of want to explore that a little bit more with you and you mentioned in connection with that that there was evidence that the windows were tinted. So the evidence, the evidence was that the front passenger window was down to some degree. Is that, am I right about that? I believe that's correct. All right, and you point out the fact that both parties point out that in Oklahoma City on that evening, on that night, it was dark. Yeah, there's testimony that it was dark and there was some light, there was some light. It wasn't totally dark, but there was some light, but it was kind of darkish. And the evidence that both sides are pointing to that Mr. Sims eyes were closed, nobody has ever argued or presented evidence about when Officer Gellingen saw that his eyes were closed, right? I did believe there's evidence of that because the officer puts it all in within, I think he said, nine or ten second frame from the time he got up there until the shooting occurred. That's exactly what I want to focus on. When Officer Gellingen is coming up, he shines a light, and you point out that both of the officers shine a light on Mr. Sims, and so then they can see that his eyes were closed. But there's no evidence, is there, and wouldn't it be completely contrary to any common sense that from a distance, when it's dark until Officer Gellingen shines the light on him, he doesn't know whether his eyes are open or closed. There's no way to know, right? It's only when he shines the light on him that he sees his eyes were closed, right? I believe that based on this record, that is correct. All right, so I want to break down, you have two basic segments of time that you're arguing that there was an unreasonable seizure. One is the reckless creation of the need for a confrontation, sort of the argument you're likening this to Allen versus the Scobie, and the argument about that apart from that, that he was not going for the gun and that he's shot in cold blood. But in terms of the reckless provocation, if Officer Gellingen can't see his eyes were closed, his front passenger window is down, he's coming up in a police uniform, wouldn't any reasonable fact finder say that, well, Mr. Sims would have seen that he's wearing a police uniform, his eyes were closed. Now it turns out that Officer Gellingen had no way of knowing that his eyes were closed, so of course he's not going to see that he's in a police uniform and particularly when he's, as you point out, when he's confronted with the glare of the light, he may not see the fact that he's in uniform. But nobody knows that, particularly Officer Gellingen, when he approaches the window, right? That's precisely why she should announce that it's the cops in there. If he's got his eyes open, there's no, I mean, if I'm sitting in my Buick and my window is down and there's a policeman that's come and I may be waiting for my wife at a convenience store, he doesn't have to say I'm a policeman, I can see he's wearing a police uniform. Right, but that assumes that the circumstances were such that he did see that he's an officer. He came up from behind and all indications are that he had his eyes closed or that he was asleep or that he was startled. So just to accept that he knew he was a police officer, I completely resist that. I think that's an open question for the fact finder. And let's not forget that the officer continued to shoot him nine or ten times, however many it was, until Escobar said, hey, stop shooting, he's dead. You didn't make the argument in the district court about that, that the later shots were excessive. You didn't separate out that argument. At least I don't see it, so I don't think that's before us. Okay, you seem to me the totality of the circumstances, all those facts are, but I respect and understand what you're saying there. Do you agree with that statement? Are you, do you agree that below you did not make a separate argument predicated solely on the excessive number of shots? I would have to say that it was not clearly articulated like that, but I believe that it's fair game given the way that all of the facts were developed and that, you know, you have to take the totality of the circumstances in which includes the amount of force that was used. So no, I don't agree that it can be with a waiver type of argument. Well, while we're talking about preservation, if Judge Backrek will let me ask this question, you didn't raise whether the issue of whether an off-duty police officer gets to take advantage of qualified immunity at all in the district court, did you? No, that, I actually think that's a red herring because the whether or not qualified immunity applies because these two issues are so folded together. Meaning that if you, that if you can't prevail on the merits of a constitutional violation, whether or not there's qualified immunity, you couldn't prevail. Right, because if the officer thought, if my client was going for his gun and the court believes there's evidence as a matter of law to that, the excessive fourth amendment claim fails anyway because, and also qualified immunity just, it just all goes away best in that fact finding. Well, but on the other side, if we say that the officer was not reasonable, that is, that there was a fourth ammunity and whether there was clearly established law out there. Are you saying, though, that we don't, we don't, that the case either turns or falls on, stands or falls on this issue of whether the officers were acting constitutionally or not? Okay, here's how I see that. If the young man was not going for his gun and the jury concludes that the officer cannot shoot, can't shoot him, that's clear, no one would debate that and therefore qualified immunity does not apply. The officer can only shoot if they have a reasonable fear for their life. But it can be mistaken, right, if it's reasonable. Well, but yeah, it has to be objective, you know, not the officer's subjective view. So, it's an objective inquiry. So, if the jury concludes that he, that he was going for his gun, well, then the case closed on both fronts, the qualified immunity and the underlying excessive force claim. That's why I think that the, whether or not qualified immunity applies or not, because he was off duty working at the second job, I just think that's a red herring. But yes, it was not raised in the court below, and the court, of course, could address it if they want, if you wanted to. But I just think that's a red herring. I think it comes down to whether or not you can accept what I've been calling the self-serving testament of the officers, given the totality of their explanation, whether or not you can accept that he did go for his gun. And I had cited in the supplemental brief four other circuit cases that talk about that. Well, it turns out there's a case cited in Judge McHugh wrote, and Judge Bacharach wrote a dissent, but didn't disagree with it, with the opinion, where it goes on about that very principle that you can't just accept the officer's testimony when the witness is shot, because, you know, he killed the only refuting witness. And that's, that's a... There has to be some contrary evidence, right? I mean, you know, this is summary judgment. And I think Judge Ebell said, point us to your best evidence that contradicts. You've got both officers saying, I saw his arms going toward the gun. You know, whether it's self-serving or not, it's evidence. We have lots of cases. Sure. Today, it's evidence. And so, while I understand Mr. Sims is in here, there's got to be some evidence that kind of contradicts that. I understand your argument about they startled him, but whether they startled him or not, if he pulls a gun on a police officer in range to shoot the police officer, I think our case law is pretty clear. The police officer can protect himself. No doubt about it. But the question is, is given the totality of the explanation and the, to me, inconsistent statements of the two officers, whether or not you can actually accept that as factually what happened. Would a jury be unreasonable by concluding that, no, I don't believe that he went for his gun? That's really what it comes down to. On the face of this testimony, would a jury be unreasonable in concluding that they had not? If you were to change that a little bit, say that I had gone up because, say that a citizen had gone up to the car, all the exact same circumstances, and then Mr. Sims went for his gun. And then so I shoot him at the exact same circumstances. And then I testify exactly like the officer did. Would that be accepted as a matter of law? I don't think so. And so it's no different just because he's a police officer because of the nature of the way it all went down. And so, you go ahead. Looks like I'm way over my time. No, that's okay. Judge Bacharach, he is way over his time and it's our fault. But could I ask him one other question? Sure. You have a claim of excessive force and you also may have a claim, and be a little bit unclear, that the officers unconstitutionally set up the problem, the conflict in the first place, by their unreasonable behavior. Let's just give you the bend for the doubt that you made that second claim. As I understand it, what you're saying they did wrong to set up, wrongfully set up the risk, was to approach the car without probable cause. That's all I understand you to be arguing for that second point. And that you are not on that second point further arguing that they set up the problem by failing to announce they were police when they actually confronted him. Can you just answer that yes or no? I didn't fully understand the yes or no question. If we assume that you are making an argument that there is a separate Fourth Amendment claim because of the officer's unreasonable behavior in setting up the conflict in the first place, right? What events did you clearly argue and assert below were done by the officer to set up, wrongfully to set up that risk? Be very brief please. I understand it is you say it was approaching the car without probable cause and that I believe is the only thing you said they did wrong. Am I right or am I incorrect? I would have to say you're incorrect. I think they can approach the car without probable cause, okay? But they can't approach the car in a way that's going to startle the guy and cause him to go for a gun thinking that he needs to because you asked me to be short so I guess that could go on. What I'm trying to get at is in that if you make that second argument, did you specifically say that one of the things the officers did wrong in setting up the risk was in failing to identify themselves as officers? Yeah, I believe that was clearly stated below in the briefing. You're confident when we look at the record below, we're going to find a statement that one of the things the officers did wrong to set up this risk unconstitutionally was to identify themselves as officers when they approached. I'm pretty sure that that is in the record. Okay, I'm not asking whether there's just some abstract fact in the record. Is that argument in the record? I believe so but... Okay, well that's enough. We'll hear from the other side if if they have anything to say on that. I've way used too much of your time. I apologize and thank you for your patience and judgment you both. Oh sure, yeah but I'm going to prolong this because I have one more question that I want to ask. You and Ms. Feltner have both said is I can best figure out exactly the opposite of the DNA report and so I pulled the DNA report to see which one of you I agree with and I have to say I really don't understand how you can say that that DNA report does not show Mr. Sims DNA on the grip of that gun. The last sentence of the and I don't I didn't bring it with me. I think I left it at home this morning but that DNA report is that best as I can tell the last sentence of the conclusion is that they compared the DNA from a known exemplar of Mr. Sims DNA to the DNA that was found on the gun. Not the blood evidence but just the DNA and that there was a match and so it wasn't his gun. Obviously the testimony was that it was the fellow in the rap concert and so when you sort of said several times both in your testimony that's not completely true is it because it wasn't Mr. Sims gun and yet his DNA was found on the grip of that gun. Doesn't that substantiate Mr. Galligan's account that in fact he did reach for the gun and put his hand on the gun on the grip of the gun? I don't think there's any dispute that he that he at some point in time had his hands on the gun. That's that's because that's the only way he could have got it was get it up from the under the back seat because the fellow that was in watching the concert had testified that he told him hey I have a pistol under the back seat and it was on his on his lap. So clearly he had the gun. The question is whether or not he grabbed it to shoot the police officer under these very highly unlikely circumstances. That to me is a fat question for the jury. Yeah you keep saying it's highly unlikely that he pulled the gun but given you know I mean we we can't speculate for why he might have pulled the gun but he's in a parking lot at a rap concert where they've had problems with gang activity. I don't think that's in the record. I think the opposite is in the record that the officer said there were no issues of dangerousness, strange criminal behavior to look out for. I'm pretty sure that's in the record. They have testimony that that's why they get hired to to uh I want to say police these um events but okay. Officer Galeon's daughter was at the concert so he clearly didn't think it was dangerous uh so I resist that inference. I think the opposite inference is is what we're we have to accept here. Well I don't think we can infer what's in the guy's head at all. Oh no that's not what I'm saying. So the issue is whether there's evidence that that contradicts both officers testimony and the DNA evidence that Mr. Sims went for the gun. I agree with that. Okay. Okay. I do I do think the court should take a second look at the uh Smart v. City of Wichita opinion uh that you actually wrote. It talks about you know when you have this scenario of the police officer's the only witness and you know and it emphasizes what I throughout here have been emphasizing. So anyway. Okay well thank you very much Mr. Hillman. I know you had intended uh to keep uh to have preserved four minutes of rebuttal and uh you ran into in the roadblock with this. So uh but I'm going to give you uh uh two minutes uh for rebuttal. Thank you. Okay you bet. Uh so I'll hear uh I think the felonies are going to divide their time. I think Ms. Feltner you wanted to go first. Yes. Can you hear me? You bet. Good morning. I'm Stacey Haas Feltner and I represent Sergeant Galleon. He was he's now a lieutenant but he was a sergeant at this time. Um I think the first point I want to make is appellant talks about self-serving testimony and the case he wrote that he I believe he's referencing from our brief is Pauley v. White which stands which does say that a court should not simply accept um what may be a self-serving account of the police officer. But Pauley then goes on to say that the court should look at the circumstantial evidence which if believed would tend to discredit the officer's testimony. And I think the issue in this case the appellant did not present any circumstantial evidence to the district court which would have disc or could have discredited Sergeant Galleon's testimony. Um so the district court didn't improperly weigh evidence or determine credibility because appellant and Sergeant Galleon were relying on the same testimony Sergeant Galleon's testimony regarding the events of the shooting. In fact I think it's important to remember appellant filed her own partial motion for summary judgment in this case stating that the facts of the shooting were undisputed and the court should rule on the objective reasonableness as a matter of law. And as this we we have lots of case law that says just because there's cross motions for summary judgment doesn't mean there's no issue of material fact. Right? We have to make a separate assessment of that. But I believe that yes I agree with that but the court has also said in Roosevelt versus Hennix versus Prickett and in Meacham versus Frazier that when the facts are uncontroverted the question of objective reasonableness is not for the jury to decide. I would say this case is a lot more like Blossom versus Yarborough where the court held it is plainly wrong to equate the refusal to admit with the affirmative submission of conflicting evidence. A plaintiff may not proceed to trial simply by asserting a jury might not believe the defendant's the defendant officer. I think that it is important to focus on the specific testimony that the district court relied on which was that Sgt. Gallion said that as he was making the statement hey man are you okay that Sims looked right at him without changing his facial expression put his hand on the butt of the gun and begin to draw it out of his waistband. And that was critical to the district court's determination that it was reasonable for Sgt. Gallion to perceive the threat and to respond with deadly force. Isn't that exactly like Pauley versus White and maybe I want to rephrase that question because it wasn't exactly like Pauley versus White but the difference seems to me to weigh in favor of the plaintiff because in Pauley versus White the you know there was a recognition from a unanimous panel that the individuals in the house were from their perspective were absolutely terrified because they thought that the confrontation earlier had led these wrongdoers to come to their house because they had no idea that the people that were surrounding the house were police officers. And so it is dark it is it's not visible to Mr. Sims or anyone who lived in Oklahoma City at that time that if someone is coming say from six feet away and it's and it's the pitch black at night you won't see their police uniforms all you will see is a guy the first thing that you see even if his eyes were open is is shining a light right in your face and viewing the evidence in the light most favorable to Mr. Sims it is counterintuitive to me that he would have been able to see anything other than the glare in the light and he sees somebody that and he's just minding his own business in the car and so to me there is at least arguably a tribal issue of fact about whether like you know some of these other cases Allen versus Muscogee State of Seville that he from their perspective from Mr. Sims perspective had every reason to believe that he was being confronted not by a police officer but maybe someone who wishes him ill he's talking to well I think this court discussed that in the case of Emmett versus Arnold and specifically talked about in the context of uniforms also that whether Sergeant Galleon identified himself as a police officer and in Emmett versus Arnold the court held that the relevant question was not whether the suspect subjectively knew that the officer was in fact a police officer but whether it was reasonable for the officer to conclude the suspect knew that Sergeant Galleon knew he was Sergeant Galleon was in a police uniform and so I think it was reasonable for him to assume that Sims knew he was a police officer even when he's shining a light I mean Officer Galleon presumably had some degree of common that he's got a got a uniform he may he presumably would realize that Mr. Sims can see nothing but the glare of that light well I think that the evidence is that the lights were on the car but not directly in Mr. Sims face Escobar said that Sergeant Galleon's light was weak so he turned his on and he was illuminating the car not directly at Mr. Sims face well the fact is that the officers at risk of getting killed when when Galleon draws the gun whether or not Galleon thought it was police or not so it really turns it really the hard question for me in this case comes down not to whether it was justified to shoot once you're there shining the light on a guy and he the earlier question of the earlier issue whether the officers acted reasonably in approaching the car in the first place now I think that the main argument that is being raised by red is yeah they they didn't approach reasonably because they didn't have reasonable suspicion I think that's a losing argument a stronger argument would be that they didn't announce they were police shined a light in the car and therefore expectedly stimulated a response that required them to killing but I'm not sure that issue was raised below that's the one I'm troubled about and so I would really I ask the other side this too but that I'd like to have you tell me whether that was articulated below whether we look at it under plain error or waiver or straight up that it was preserved I believe the plaintiff raised the issue not in the complaint but in their measurements for summary judge in the summary judgment briefing as to whether they the officers had reasonable suspicion to approach the car I do not believe that reasonable suspicion is what we're looking at here because I never think I don't believe the officers ever got past the first part of the Bostic test consensual encounter I mean the case law from this circuit is clear that an officer may approach a vehicle in a public place or a person in a public place ask a few questions even ask to see ID in the case of United States versus Ms. Felkner I am not at all worried about the officer's ability to approach the car just not worried about that that's not what I'm trying to ask you and if that was the argument raised below I think that the defendant or the red is going to lose my concern is I think clearly the officers could approach the car my question is is there and was there made below an argument that after they got to the car which they had the right to be right there at the car did they unreasonably provoke the need to shoot him because they didn't announce they were officers but rather startled him by shining lights on him and within a few seconds had therefore to kill him in order to prevent themselves from getting shot I do not believe that argument was clearly made below I mean I I believe Alan was mentioned but I think this case is very different from Alan I would say the officer did what the officers and Alan should have done he they he didn't come up to the window of the immediate correct all the way up to the window of the car he didn't start reach in and try to grab the gun he from a distance of six feet said hey man are you okay and so I would say that's a much less threatening approach than in Alan I think it is but it's very different if they said we are police officers are you okay rather than hey man are you okay I mean that's a fairly ambiguous statement if I'm approached in a dark alley by somebody who says hey man are you okay I'm not necessarily comforted by that inquiry well I think this is just okay I think the issue is that the officers really didn't have time to do much unless they had time to make an initial statement are you okay but they never did address that they were officers I'm yet I think if isn't there at least a doubt that maybe should go to a jury about whether this whole outcome would have been different if their first question first statement had been we are police officers hey man are you okay he might then not have felt threatened might not have had to draw his gun and all this scenario might not have happened so to me it turns not on their response once he started to draw the gun but rather the earlier cause of action did they unconstitutionally set up a bad situation in the first place and I just am unclear how how that was raised below and whether it's preserved and what our standard review for that is on this case I believe unless you're going to adopt a rule a per se rule that an officer can never approach someone in a parking lot an officer that has nothing to do with it of course they can approach people in a frightened lot of course they could approach him uh you've gotta you can't win this argument by misstating at least my concern I I couldn't have been clearer that I think the officers could approach him in this parking lot if you got something to add fine otherwise I'll just let you move on to your other argument I believe under Emmett versus Arnold the officers were retired were entitled to rely on the fact that they were in uniform as enough of an immediate announcement that okay thank you okay uh can I take a crack at it Judge Abell and uh uh because I I think there may be a little bit of uh disconnect so what Judge Abell is I think asking uh and I don't mean to be presumptuous is not on the merits of the argument but this argument that Mr. Hoopman is making to us that the officers recklessly created this you know the need uh for a recklessly created a dangerous situation that called for Officer Galligan uh to to pull a gun on Mr. Sims I think Judge Abell is just saying did Mr. Hoopman make that that argument in district court on the summary judgment briefing I don't believe he made that specific argument I believe he raised the the argument in the context of whether the officers have reasonable suspicion to approach the car okay can I ask you a follow-up question have you argued to us that he forfeited that argument I I'm sorry I didn't understand that question well so I'll explain my question and then I'll again so we have cases saying that even when an appellant forfeits an argument we call it sometimes waiver of waived waiver waiver of waiver of forfeited forfeiture when an appellant forfeits an argument by failing to raise it in district court that sometimes we'll say we're going to overlook the forfeiture if the appellee hasn't argued to us that the appellant forfeited the argument so that's why I'm trying to ask you is have you argued to us that Mr. Hoopman forfeited that argument you just basically said that he did forfeit no your honor I did not make that the forfeiture argument in the context of the reasonableness of the use of force okay thanks um I guess I will reserve the last minute and a half and let Mr. Tucker talk if he has anything he would like to say Eric can you hear me sure and uh so just the city uh defendant city and of Oklahoma City and defendant uh chief Williams city case largely turns on how this court rules on the uh whether there's an actual constitutional violation um with Mr. Galleon as the district court held um that his actions were objectively reasonable when viewed in perspective a reasonable officer at the scene and concluded there was no constitutional violation um and then went on to hold that because there was no constitutional violation that summary judgment is proper for uh the defendant city of Oklahoma City and uh chief Williams city um I'll be glad to answer any questions over the failure to train and failure to supervise I see we're running out of time um I know we have to get back to the plaintiff um but if not I respectfully request this court affirm the district court's granting of summary judgment um in favor of in reading the brief um filed by your opponent did you um read it as raising two issues one whether there was probable cause to approach the car and two whether they approached the car in an unreasonable fashion that instigated the deadly force incident I read the appellant's to raise it simply in the in the concept context of um probable cause to approach the car um quite often they said you know they approached the car in an unreasonable manner they had no rights no constitutional right to approach the car um I did not read it to read that they created a uh situation um that turned disastrous can I ask you uh about the uh the the the four shots that forensic evidence indicated that uh had occurred even uh either when Mr. Sims was slumped over the steering wheel or had turned away that does suggest that under Fancher under uh Judge McHugh's excellent opinion and smart perhaps that uh the first shot might have been uh arguably fine maybe the second or third uh shots were fine but the evidence as I understood it was that Officer Galligan had been trained to uh to to do basically each burst of gunfire would involve two or three shots that he would hold the hold the trigger uh you know pull the trigger two or three uh one two or three times and then since there were nine shots four were once were at were uh landed according to the by definition and you know just simple math would have been the third burst of gunfire and so if there were more than one gunshot uh it was more than one gunshot after he had turned away or had been incapacitated as a threat why wouldn't under smart for example or Fancher that at least to be a triable issue or fact about whether or not Officer Galligan unreasonably used force with regard to at least three of those gunshots well your honor um first I believe the case law is that if if one shot is required then you know 12 or more are okay also um the as far as being trained to do a two to three round burst at each shot regardless of how anyone is trained they're also trained not to stop firing or they don't have to stop firing until the threat has been abated I guess that's what I'm getting getting the threat at least a tribal issue of fact viewing the evidence favorable to this recruitment would be that the threat had been abated when he was stumped over the steering wheel or it turned away that was what you know what happened for example in smart and Fancher yes your honor but I believe also you can get off uh you know nine to twelve shots in under two seconds um it wasn't like he shot three weighted shot under three weighted shutter three um he could have gotten you know the whole magazine 15 shots out in three seconds or less um just how he perceived that reasonable officer at the time perceived the thing and as as the evidence showed they saw the pistol in the waistband and then it wound up on the left leg so clearly he had drawn it because just being shot in the shoulder or the back isn't going to dislodge a pistol from a waistband and move it over to the other side of the person's body he clearly had his hand on to take it out and did remove it from the waistband otherwise it would not have wound up on the other side of the car so how far was the officer away from him when he shot him I believe the testimony was about six feet so he really wasn't very worried about missing the target I mean I know pistols aren't terribly accurate at long distance but at six feet they are very accurate yes your honor I I still don't I mean he clearly felt threatened he that is the arm is still going up um and so he continued to shoot until until the uh decedent had slumped over basically and in um the case smart the case that Judge Bacharach referred to there was testimony from a witness that said that Mr. Smart there was a burst of bullets Mr. Smart was on the ground with his hands out and and the gun was not within reach and Mr. Smart turned around looked at the officer shook his head and the officer shot him three more times in the back is there any evidence here that shows the officer that from which a jury could find that the officer was aware that the threat had passed and then shot more bullets your honor I don't see any evidence of that I think the evidence is clear that it was a continuous stream of fire and he fell to his left as he was being shot and that's how they we wound up with bullets in the back I don't think there's any evidence um from from Escobar or galleon or anybody that he stopped firing you know assessed and then continued to fire at all I don't I don't think that we have those facts at all here your honor uh Judge McHugh do you have any more questions for either the felon's counsel no uh no thank you okay uh Mr. Hinton uh a few uh minutes for rebuttal okay uh the the way I have in my own personal notes summarize the poly case is a police saw a police shot a man inside his house without making it clear in advance that there were police so that's exactly it matters in poly that um that the distance was I think 20 to 25 feet and they were behind a wall I think that all those details that's the problem in all excessive force cases the details are all varied but yeah the the devil's in the details does that make a difference in this case I don't think so because the point I think it makes the difference if he's the officer is within six feet of a gun that the officer sees being pulled if the officer sees a gun being pulled and an objectively reasonable officer thinks he's about to get shot he can shoot and um but in this situation we have all these circumstances that have been really delved into here where they came up from behind it was dark they didn't announce they were police uh their tenant windows and so I just again I don't think you can just accept that that they they knew that they that he knew he was a police officer and uh and let's not forget that it's not illegal to have a gun in a car you know you can't officer can't shoot somebody because they have a gun in the car they have to actually have an objectively reasonable belief that they're about to be shot themselves right but it is illegal to pull that gun on anybody whether you're a police officer or somebody coming up to sell them raffle tickets in the park I'm definitely not arguing the opposite of what you just said clearly that's the crux of the matter I could go on but I think I've really beat this subject matter to a pulp well we probably all have but it's important it's a very important issue and it's been well well presented uh Judge McHugh uh do you have any further questions for anybody no thank you Judge Baccarin uh Judge Avell no thank you I appreciate uh uh all three counsel indulging us uh I know we've caused all of you to go over time uh it is very important it's a very important case as every single one of our cases are and it's been very well presented in your briefs and in your oral arguments and so we do so greatly appreciate the uh the great preparation and the advocacy uh in your written and oral commission so uh we'll take this uh under advisement we'll issue a decision and the court will be uh in recess until uh uh one o'clock central time I guess uh 12 o'clock mountain time uh this afternoon